## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**TELESWEEPS of BUTLER VALLEY, INC. :**

|  |  |
|---|---|
| **Plaintiff** | : |
| **v.** | : **3:12-CV-1374** |
| | : **(JUDGE MARIANI)** |
| **LINDA KELLY,** Attorney General of the | : |
| Commonwealth of Pennsylvania, and | : |
| **STEFANIE SALAVANTIS**, District | : |
| Attorney of Luzerne County | : |
| | : |
| **Defendants** | : |

## MEMORANDUM OPINION

### I.  Introduction

Plaintiff Telesweeps of Butler Valley, Inc. ("Telesweeps" or "Plaintiff") filed a Verified

Complaint and Motion for a Temporary Restraining Order and Preliminary Injunction on July

17, 2012 seeking, *inter alia*, a declaratory judgment that Pennsylvania Act 81 of 2012

violated its First Amendment free speech and Fourteenth Amendment due process rights.

(Doc. 1).  On July 25, 2012, three casinos[1] ("Casinos" or "Intervenors") moved to intervene

as a matter of right under FED. R. CIV. P. 24(a) or, in the alternative, for permissive

intervention under Rule 24(b).  (Doc. 10).  The Court granted the motion on July 30, 2012.

Following oral argument on August 7, 2012, the parties elected to have an evidentiary

hearing on September 25, 2012.

---

[1] Downs Racing, L.P. d/b/a Mohegan Sun at Pocono Downs, Sands Bethworks Gaming, LLC, and Greenwood Gaming and Entertainment, Inc. d/b/a Parx Casino.

Plaintiff's motion having been fully briefed, and the Court having heard the parties'

oral arguments and received their evidence, the motion is ripe for determination.

## II. Summary of Facts

On June 30, 2012, the Pennsylvania General Assembly passed Act 81 of 2012 ("Act

81"), 18 PA. CONS. STAT. § 5513(a.1), which makes it a misdemeanor of the first degree to

own, operate, maintain, place into business or have a financial interest in an electronic

video monitor:

> (1) which is offered or made available to persons to play or participate in a simulated gambling program for direct or indirect consideration, including consideration associated with a related product, service or activity; and

> (2) for which the person playing the simulated gambling program may become eligible for a cash or cash-equivalent prize, whether or not the eligibility for or value of the cash or cash-equivalent prize is determined by or has any relationship to the outcome of or play of the simulated gambling program.

Act 81 goes on to define the term "simulated gambling program" as "any method intended to

be used by a person interacting with an electronic video monitor in a business

establishment that directly or indirectly implements the predetermination of sweepstakes

cash or cash-equivalent prizes or otherwise connects the sweepstakes player or participant

with the cash or cash-equivalent prize." 18 PA. CONS. STAT. § 5513(f).

At the evidentiary hearing, Plaintiff called several witnesses, both factual and expert,

to testify about how Telesweeps operates.[2] David Bogansky, owner of Lynrose Consulting

---

[2] When the parties' witnesses observed the operations of Telesweeps, the facility was closed to the public, so there was no opportunity for the witnesses to observe the clientele or any customer purchasing habits.

and consultant for Pong Marketing & Promotions, Inc., testified that Telesweeps is in the business of selling both domestic and international phone cards, as well as cellular phone accessories, office products and services, and Internet time at its on-site computer terminals. (Tr. of Evid. Hearing at 8:7-9:13; 10:20-11:10).

Michelle des Lauriers, an expert in the phone card industry, testified that the "going rate" for domestic calling cards is between four and five cents per minute, as exemplified by AT&T calling cards. The phone cards are competitively priced at three cents per minute for the domestic TelConnect cards and beginning at five cents per minute for the international InterConnect cards. (*Id*. at 87:25-88:3). At three cents per minute, Plaintiff's TelConnect cards are "highly competitive." (*Id*. at 88:4-25). Upon entering Telesweeps, a customer is met immediately with various and sundry advertisements promoting the phone cards. (*Id*. at 94:2-7). As such, Ms. des Lauriers testified that Plaintiff's phone cards are a valuable product and are not shams. (*Id*. at 92:7-14). The market for phone cards includes, but is not limited to, "students, families of military who are out of the country or in another place within the country, people who are traveling" who wish to avoid incurring roaming charges, businesspeople who wish to separate their billings, and people who do not own phones. (*Id*. 95:5-13). However, Ms. des Laurier did not know what the customer pool was for Telesweeps, in particular. (*Id*. at 100:7-9). She was also not provided with any information regarding how many phone cards had been sold or how many sweepstakes points or credits were given to customers who purchased the phone cards. (*Id*. at 100:17-25).

According to Mr. Bogansky, Telesweeps uses sweepstakes entries as a promotional tool to boost sales of the phone cards. Such entries come with the purchase of a product commensurate with the amount of the purchase. (Id. at 22:4-9). Consuming all of one's sweepstakes entries does not diminish the value of the phone card; "you're not expending your product to play the sweepstakes." (Id. at 23:14-19). In other words, buying a $10 calling card and using up all of the 1,000 corresponding sweepstakes entries will not result in any reduction in value of the $10 calling card. Even after all of the entries are consumed, the customer still has the full value of the card to use. Sweepstakes entries are not for sale and cannot be purchased. (Id. at 27:13-16).

No purchase is necessary to enter the sweepstakes. If a customer wishes to "play" without purchasing a product, he may take advantage of a limited number of free daily entries. (Id. at 22:9-11). Each day, a customer may obtain 100 free sweepstakes entries or credits. (Id. at 25:1-9; 68:18-25). The minimum "bet" per game is 25 credits (Id. at 180:12-13), so a customer can play up to 4 games for free each day or use all 100 entries in one game. Anyone is welcome to participate in free daily plays "as long as they're [sic] 18 [or older]." (Id. at 24:14-19). Alternatively, a customer may write in a request for points. Once a written request for points is received, Telesweeps mails back a certificate valid for 200 points which the customer can redeem in person for entries. (Id. at 22:11-21). There is no limit to how many free entries a customer may receive by mail, but each request must be in a separate envelope. (Id. at 26:11-13). Once a customer exhausts his free plays per day,

4

he must purchase a product before he will receive any further sweepstakes opportunities. (*Id.* at 22:6-9; 68:8-15). Dave Bogansky testified that since Telesweeps opened, he has received 28 written requests in the mail for sweepstakes entries. (*Id.* at 35:18-21).

All methods of entry (whether obtained for free or after purchasing a product) are treated alike and no type of entry has any greater chance of winning a prize than any other. (*Id.* at 27:9-12). This same treatment is referred to as "equal dignity," and Ms. des Lauriers testified that Plaintiff operated its sweepstakes under equal dignity. (*Id.* at 92:15-24; 93:19-20) ("It's the same game, it's the same prizes, it's the same odds.").

According to Mr. Bogansky, once a customer creates an account to "play," he receives a card with a pin number. He may swipe the card at a computer terminal to begin playing or manually enter his pin number. (*Id.* at 31:15-21). To learn whether he has won a prize, a customer may: (1) ask the cashier, who will look up the results directly at the register computer, or (2) use the "game display" at his own computer terminal which will display the results through alphanumeric text, graphic icons, and code. (*Id.* at 22:25-23:10; 86:21-22). The odds of winning are available at each computer terminal. (*Id.* at 33:15-25).

The "game display" is tailored to mimic slot machines and other amusing casino-style games. (*Id.* at 28:19-23). According to Richard Williamson, a witness for the Intervenors, "the experience is exactly like a slot machine." (*Id.* at 179:17-19). "From the player's perspective, . . . every outcome is a random outcome," so a player would perceive a slot machine and an internet sweepstakes as the same. (*Id.* 181:20-25).

Nick Farley, an expert in gaming software and hardware, testified that when a customer "plays" a game, he cannot affect his chances of winning or alter the outcome. Rather, "the game is just a means to reveal the sweepstakes entry. Engaging in game play or anything like that is not really happening, you can't affect the outcome of what's going to be revealed from a sweepstakes entry." (*Id*. at 117:20-23). Therefore, no matter what game a customer uses to display the results of an entry, and no matter what choices he makes within that game, the outcome is pre-determined. For instance, if a customer chose to play poker and received a hand of four aces and elected to discard his winning hand, it would not affect whether he won a prize during that game. (*Id*. at 118:13-19). Each game contains "directions" on how to maximize the chances of winning a hand. For example, in the poker games, there are suggested holds that a player should attempt to assemble.

However, despite these "directions," neither failure to follow them nor strict adherence to them will affect the outcome of the game. (*Id*. at 135:4-25). Mr. Farley admitted that "[i]t does give the participant the, if you will, the look and feel of participating in actual poker, even though the prize is determined, and no matter what decision they make, they're going to get that prize." (*Id*. at 135:22-25). The Intervenors' witness characterized it differently: the instructions "created the illusion . . . that your choice of cards would have an impact on the result that you could obtain." (*Id*. at 189:7-11).

Mr. Farley stated that the computers at Plaintiff's facility do not utilize a "random number generator," which is more often associated with the operation of slot machines

which are "tested and certified to make sure that those [random] outcomes occur freely, so any outcome can occur at any time and be repeated game after game." (Id. at 120:10-14). Instead, at Telesweeps, the "finite pool of entries is predetermined in advance of the start of the game promotion and only stored in the [on-site] server for delivery to the PCs." (Doc. 25, at 3-4; see also Tr. of Evid. Hearing at 115:9-13; 23-25). More specifically, "the pools are created and randomized and then stored, and then the entries are delivered sequentially from that pool." (Tr. of Evid. Hearing at 132:11-13). It is impossible to tell how many winners a slot machine will have in advance, whereas for a sweepstakes system, all of the outcomes are known in advance. (Id. at 122:3-13). Mr. Farley testified that when he tested Plaintiff's software, he learned that there were 83 million sweepstakes entries, but he did not know how many were winning entries. (Id. at 127:16-21).

Richard Williamson, a former employee of the New Jersey Division of Gaming Enforcement and former Director of Gaming Laboratory Operations in the Pennsylvania Gaming Control Board, was admitted as an expert in gaming law, gaming devices, and the testing of gaming devices. (Id. at 177:25-178:17). Mr. Williamson characterized both the daily free 100 credits and the phone cards themselves as de minimis values. (Id. at 180:16-23; 192:1-3). He also testified that the phone card product is "passé, people don't use it anymore, as a rule. People have Skype,[3] they've got other methods of communication that are readily available. . . . phone cards are a dying commodity." (Id. at 191:21-192:3).

---

[3] Skype is an online service by which users can make internet calls to other Skype users for free. SKYPE, http://about.skype.com/ (last visited Oct. 5, 2012).

Therefore, in Mr. Williamson's eyes, the phone cards were a "ruse" because when a customer "has reached the end of the free credits . . . , they haven't even used their phone time, and they're going back up and buying more phone time, sitting down at the device again." (*Id*. at 196:23-25). Mr. Williamson further testified that "it's a sham process because people are not -- because, as a consumer, I would not be interested in the product and I feel I represent a large number of people out there. People are going in for the simulated gaming activity and for the play." (*Id*. at 200:17-21).

Mr. Bogansky admitted that Telesweeps does not pay any type of gaming tax to the Commonwealth of Pennsylvania. It pays only sales tax and whatever corporate taxes are due. (*Id*. at 44:18-25). Mr. Williamson testified that Telesweeps has not purchased a gambling license, which costs $50 million for legal casinos, or investigative fees. (*Id*. at 195:17-22).

The witnesses agree there are no state regulations governing how Telesweeps operates, including the payout percentage in its sweepstakes. (*Id*. at 45:8-12; 136:13-18). Though Plaintiff's primary business is selling pre-paid telephone calling cards, it does not appear to keep a record of how many cards or minutes have been sold or used. (*Id*. at 69:23-70:25). In lieu of such evidence, Plaintiff submitted an affidavit from a representative of Pong Marketing which included some data on nationwide use of the calling cards. (Rahi Aff., Doc. 25, Ex. 1).

## III.  Standard for Preliminary Injunction

A court must consider four factors when ruling on a motion for preliminary injunction: (1) whether Telesweeps has shown a reasonable probability of success on the merits; (2) whether Telesweeps will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the Commonwealth of Pennsylvania; and (4) whether granting preliminary relief will be in the public interest. *Am. Exp. Travel Related Services, Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012).[4]  "The burden lies with the plaintiff to establish every element in its favor, or the grant of a preliminary injunction is inappropriate." *P.C. Yonkers, Inc. v. Celebrations the Party and Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005).

## IV.  Analysis

### a.  Reasonable probability of success on the merits

#### 1.  Conduct or Speech?

Plaintiff asserts that Act 81 prevents "its expression or communication by way of computer or electronic video device" to inform a patron of whether he has won a sweepstakes prize.  (Doc. 9, at 6).  Before the Court can reach the question of whether Act 81 impinges on Plaintiff's First Amendment free speech rights, it must first determine whether the activity at issue is "sufficiently imbued with elements of communication to fall

---

[4] Plaintiff has moved for both a temporary restraining order and a preliminary injunction.  The oral argument and evidentiary hearing were aimed at the propriety of issuing both forms of relief.  Because the standards are the same for both the issuance of either a temporary restraining order or a preliminary injunction, the Court will consolidate its analysis.  *See Trefelner ex rel. Trefelner v. Burrell Sch. Dist.*, 655 F. Supp. 2d 581, 589 (W.D. Pa. 2009).

within the scope of the First and Fourteenth Amendments."[5]  *Spence v. State of Washington*, 418 U.S. 405, 409, 94 S. Ct. 2727, 41 L. Ed. 2d 842 (1974).

In other words, is the activity which Act 81 regulates conduct or speech?  Act 81 amended Section 5513 of Pennsylvania's Crimes Code entitled "Gambling devices, gambling, etc."[6]  Under Pennsylvania law, for an activity to constitute gambling, there must be: (1) consideration, (2) a result determined by chance rather than skill, and (3) a reward. *Commonwealth of Pennsylvania v. Two Electronic Poker Game Machines*, 465 A.2d 973, 977 (Pa. 1983).

To determine whether Act 81 regulates conduct or speech, the Court turns first to the language of the statute itself.  Act 81 states in pertinent part:

> A person commits a misdemeanor of the first degree if he owns, operates, maintains, places into operation or has a financial interest in an electronic video monitor[7] or business that owns, operates, maintains or places into operation or has a financial interest in an electronic video monitor:
>
> (1) which is offered or made available to persons to play or participate in a simulated gambling program for direct or indirect consideration, including consideration associated with a related product, service or activity; and
>
> (2) for which the person playing the simulated gambling program may become eligible for a cash or cash-equivalent prize, whether or not the eligibility for or value of the cash or cash-equivalent prize is determined by or

---

[5] The First Amendment applies to state governments and their officials through the due process clause of the Fourteenth Amendment .  *United Bhd. Of Carpenters & Joinders of Am. v. Scott*, 463 U.S. 825, 831 (1983).

[6] The Commonwealth argues that while operations, such as internet sweepstakes cafes, "could be prosecuted as illegal lotteries under 18 PA. CONS. STAT. § 5512, the Crimes Code and the Gaming Act did not directly address this new way of using technology to conduct gambling." (Doc. 20, at 4).  As such, Act 81 was enacted to cover internet sweepstakes cafes and close any loopholes that existed under the previous criminal statutes.

[7] "Electronic video monitor" is defined as "[a]n electronic device capable of showing moving or still images." *Id.* at § 5513(f).

has any relationship to the outcome of or play of the simulated gambling program.

18 PA. CONS. STAT. § 5513(a.1). "Consideration associated with a related product, service or activity" is defined as "[m]oney or other value collected for a product, service or activity which is offered in any direct or indirect relationship to playing or participating in the simulated gambling program. The term includes consideration paid for computer time, Internet time, telephone calling cards and a sweepstakes entry." *Id.* at § 5513(f). Act 81 goes on to define the term "simulated gambling program" as "any method intended to be used by a person interacting with an electronic video monitor in a business establishment that directly or indirectly implements the predetermination of sweepstakes cash or cash-equivalent prizes or otherwise connects the sweepstakes player or participant with the cash or cash-equivalent prize." *Id.*

Put simply, for criminal liability to attach under Act 81, a person or business must have (1) some interest in an electronic video monitor, which (2) allows a user to participate in a simulated gambling program, (3) after that user has paid consideration in some form (4) for a chance at winning (5) a cash prize. Thus, Act 81 incorporates all three elements of gambling: consideration (direct or indirect), a chance to win, and a reward, (cash prize). In addition, to fall within the ambit of Act 81, the gambling activity also must use an electronic video monitor which displays a simulated gambling program. If a single element is missing under Act 81, then no criminal liability attaches. Thus, the Court concludes that, when considered as a whole, Act 81 targets *conduct* which the Commonwealth of Pennsylvania

has labeled "gambling" and does not implicate the First Amendment Free Speech Clause.

To withstand a constitutional challenge, then, Act 81 need only have a rational basis for

regulating simulated gambling programs through electronic video monitors. "If a legislative

classification or distinction neither burdens a fundamental right nor targets a suspect class,

we will uphold [it] so long as it bears a rational relation to some legitimate end." *Vacco v.*

*Quill*, 521 U.S. 793, 799, 117 S. Ct. 2293, 2297, 138 L. Ed. 2d 834 (1997) (internal citation

and quotation marks omitted).

Plaintiff cites *Brown v. Entm't Merchants Ass'n* for the proposition that simulated

gambling programs are entitled to free speech protection. -- U.S. --, 131 S. Ct. 2729, 2733

(2011) ("Like the protected books, plays, and movies that preceded them, video games

communicate ideas—and even social messages—through many familiar literary devices

(such as characters, dialogue, plot, and music) and through features distinctive to the

medium. . . . That suffices to confer First Amendment protection."). Despite Plaintiff's

contention that simulated gambling programs are like video games which are entitled to

First Amendment speech protection, the sweepstakes games themselves and the words

used within the games do not constitute protected speech. Unlike in *Brown*, the simulated

gambling programs at issue here do not contain plots, storylines, character development, or

any elements that would communicate ideas. Rather, the words associated with the display

merely state whether a player has won a prize by displaying a depiction of, for instance,

three cherries.

> Is bingo speech? People buy cards in the hope of winning back more than they spend. A voice at the front of the hall drones "B-2" and "G-49"; after a while someone at the back of the hall shouts "BINGO!" and gets a prize. These words do not convey ideas; any other combination of letters and numbers would serve the purpose equally well. They employ vocal cords but are no more "expression" than are such statements as "21" in a game of blackjack or "three peaches!" by someone who has just pulled the handle of a one-armed bandit. Statements promoting gambling are speech, albeit without the first amendment protection accorded to political speech, but wagering money is an activity – just as the business of leasing property is not speech and may be regulated by zoning laws and the like, even if the lessee wants to put on a play or open a newsstand. Gambling has traditionally been closely regulated or even forbidden, without anyone suspecting that these restrictions violate the first amendment.

*There to Care, Inc. v. Comm'r of Indiana Dep't of Revenue*, 19 F.3d 1165, 1167-68 (7th Cir. 1994); *see also Allied Veterans of World Inc., Affiliate 67 v. Seminole County*, 783 F. Supp. 2d 1197, 1202 (M.D. Fla. 2011) (finding that gambling is not protected speech "because . . . the interaction and communication involved in these types of simplistic games is singularly in furtherance of the game; it is totally divorced from a purpose of expressing ideas, impressions, feelings, or information unrelated to the game itself."); *Serpico v. Village of Elmwood Park*, 799 N.E.2d 961, 968 (Ill. App. Ct. 2003) (affirming district court's finding that an ordinance banning simulated video gaming devices did not implicate First Amendment protections, and the ordinance was rationally related to a legitimate governmental interest in regulating illegal gambling) (internal citations and quotation marks ornitted).[8] "[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct

---

[8] Plaintiff argues that the Supreme Court's decision in *Sorrell v. IMS Health Inc.*, -- U.S. --, 131 S. Ct. 2653, 180 L. Ed. 2d 544 (2011) supersedes the above-cited cases in which courts held that the speech associated with slot machines or other gambling devices was unprotected. The Court rejects this argument in its discussion of *Sorrell* below.

illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456, 98 S. Ct. 1912, 1918, 56 L. Ed. 2d 444 (1978) (internal citations omitted).

Therefore, if *traditional* gambling devices or games, such as slots or blackjack are not considered protected speech, then neither are *simulated* gambling programs: the speech is no more protected because it is transmitted by an electronic video monitor than orally by a lucky winner or via a traditional slot machine.

In support of its argument that Act 81 targets protected speech, Plaintiff relies heavily on *Sorrell v. IMS Health Inc.*, -- U.S. --, 131 S. Ct. 2653, 180 L. Ed. 2d 544 (2011), but the case is of little applicability to this situation. In *Sorrell*, the Vermont Legislature enacted a statute which forbade the sale of doctors' prescription-buying preferences to pharmaceutical manufacturers for marketing purposes but allowed the same information to be sold to other users, for example, for "educational communications," thus favoring academic research over marketing. 131 S. Ct. at 2663. The Supreme Court held that such a statute impermissibly imposed both content-based and speaker-based restrictions on the availability and use of prescriber-identifying information.

The information was most likely speech entitled to protection because "[f]acts, after all, are the beginning point for much of the speech that is most essential to advance human knowledge and to conduct human affairs." *Id*. at 2667. There was little doubt that databases of doctors' prescription-buying preferences were speech entitled to protection

14

because the value of the databases was communicative in nature of doctors' preferences.
The Supreme Court assumed that the speech merited protection whereas the inquiry here
necessarily began with the question of whether or not there is speech at all.

Though *Sorrell* post-dates *There to Care* and other cases in which courts have found
speech associated with gambling devices is unprotected, it does not vitiate those holdings.
As the Supreme Court has said, "[w]e cannot accept the view that an apparently limitless
variety of conduct can be labeled 'speech' whenever the person engaging in the conduct
intends thereby to express an idea" or to provide information. *United States v. O'Brien*, 391
U.S. 367, 376, 88 S. Ct. 1673, 20 L. Ed. 2d 672 (1968).

Even assuming that there is some protected speech element involved in Plaintiff's
sweepstakes, the Commonwealth of Pennsylvania may still regulate activity within its police
power.  As the Supreme Court has stated, "when 'speech' and 'nonspeech' elements are
combined in the same course of conduct, a sufficiently important governmental interest in
regulating the nonspeech element can justify incidental limitations on First Amendment
freedoms." *Id.* at 376, 88 S. Ct. 1673.  If there is any speech involved here at all, the burden
imposed on it is incidental because the crux of Act 81 is to regulate illegal gambling
conduct.

Plaintiff also attempts to shoehorn its sweepstakes into conduct which "may have a
communicative nature which entitles it to First Amendment protection." (Doc. 9, at 2) (citing
*see, e.g., Texas v. Johnson*, 491 U.S. 397, 103 S. Ct. 2533, 105 L. Ed. 2d 342 (1989) (flag-

burning); *Tinker v. Des Moines Indep. Sch. Dist.*, 393 U.S. 503, 89 S. Ct. 733, 21 L. Ed. 2d 731 (1969) (wearing black armbands to protest the Vietnam War); *Thornhill v. Alabama*, 310 U.S. 88, 60 S. Ct. 736, 84 L. Ed. 1093 (1940) (labor picketing)). By attempting to compare the "speech" involved in its sweepstakes to such symbolic expressions as flag-burning or protesting a war, Plaintiff trivializes speech that properly was considered expressive and worthy of First Amendment protection. Thus, *Brown* and *Sorrell* do not apply to this case, and Act 81 regulates conduct.

Though very few courts have addressed precisely the same issue as is presented in this case, the Court finds *Allied Veterans of World Inc., Affiliate 67 v. Seminole County* particularly persuasive. 783 F. Supp. 2d 1197 (M.D. Fla. 2011), *aff'd*, No. 11–12185, 2012 WL 933342 (11th Cir. Mar. 21, 2012).[9] Finding that the ordinance at issue regulated conduct and not speech, the court in *Allied Veterans* remarked:

> the Ordinance in no way prohibits access to the internet; it only regulates the simulated gambling devices. Furthermore, although the games . . . may constitute protected speech, the Ordinance only bans the games if all elements of the definition of "simulated gambling device" are present. . . . None of the video games at issue is banned on its own-only the playing of such a game in conjunction with the possibility of a payoff is banned. Therefore, Operator–Plaintiffs are free to provide the video games to their patrons and their patrons are free to play them—and thus make and receive whatever protected message is communicated by the video game—so long as the games are not associated with the conduct of a payoff.

---

[9] *See also Crisante v. Coats*, No. 8:11-CV-2007-T-17TBM, 2012 WL1565424, at *11 (M.D. Fla. May 2, 2012) (dismissing the plaintiff's reliance on *Brown v. Entm't Merchants Ass'n*, -- U.S. --, 131 S. Ct. 2729, 180 L. Ed. 2d 708 (2011) because "the Ordinance did not outlaw the *speech* underlying the sweepstakes games itself, but rather proscribed the *conduct* of providing a payoff when facilitating the use of a simulated game device.") (emphasis in original).

*Allied Veterans*, 783 F. Supp. 2d at 1202. This is the same scenario as here. Telesweeps

may continue to sell phone cards, customers may still use the Internet, and Telesweeps

may even offer customers simulated casino games, "so long as the games are not

associated with the conduct of a [cash prize]." *See id.*

Nonetheless, Plaintiff relies on a North Carolina appellate court decision in which the

state court found a similar statute unconstitutional on First Amendment grounds. *Hest*

*Tech., Inc. v. North Carolina*, 725 S.E.2d 10 (N.C. Ct. App. 2012). The statute sets forth, in

relevant part:

> Notwithstanding any other provision of this Part, it shall be unlawful for any
> person to operate, or place into operation, an electronic machine or device to
> do either of the following:
>
> (1) Conduct a sweepstakes through the use of an entertaining display,
> including the entry process or the reveal of a prize.
>
> (2) Promote a sweepstakes that is conducted through the use of an
> entertaining display, including the entry process or the reveal of a prize.

N.C. GEN. STAT. § 14–306.4(b) (2011). "Sweepstakes" is defined as "any game, advertising

scheme or plan, or other promotion, which, with or without payment of any consideration, a

person may enter to win or become eligible to receive any prize, the determination of which

is based upon chance." *Id.* at § 14–306.4(a)(5).

Because the statute did "not limit the definition of entertaining display," the North

Carolina court found it was overbroad and "ultimately bans all visual information . . . that

takes the form of actual . . . or simulated game play." *Hest*, 725 S.E.2d at 14 ("it is the

17

specific method of disseminating sweepstakes results through an entertaining display that is criminalized by [the statute]."). The court's decision turned on the statute's improper focus on the method of communication instead of the underlying conduct.

While this Court understands the North Carolina appellate court's reasoning, in the undersigned's view, the state court placed too great an emphasis on the phrase "entertaining display" in isolation from others. Rather, this Court is inclined to agree with the dissent in *Hest* because it viewed the statute as regulating conduct rather than speech, leading to the conclusion that the Supreme Court's decision in *Brown* was inapplicable.[10] *Id.* at 17 (Hunter, J., dissenting). Judge Hunter also determined that "Plaintiffs are free to allow anyone to play their video games so long as the video games are not used to conduct or promote sweepstakes." *Id.*

Thus, it is clear from the construction of Act 81 that the proscribed gambling activity must be in conjunction with the use, for direct or indirect consideration, of an electronic video monitor to display simulated gambling programs and to communicate the results of the sweepstakes to the player. Based on an analysis of the text of Act 81 and the relevant law alone, Plaintiff fails to meet its burden of proof to show a reasonable probability of success. Even on the facts, though, Plaintiff has not made its case.

---

[10] Likewise, in *Allied Veterans*, when the plaintiffs filed a motion to stay pending appeal and presented the district court with the Supreme Court's decision in *Brown*, the district court also found *Brown* inapplicable because the California statute in *Brown* banned access to violent video games, whereas the Seminole County "Ordinance in no way ban[ned] access to the games." No. 6:11-CV-155-Orl-28DAB, 2011 WL 3958437, at *1 (M.D. Fla. Sept. 8, 2011). Similarly, Act 81 in no way bans access to the simulated gambling programs that Telesweeps offers to customers so long as there is no consideration received from a customer in exchange for a chance to win a cash prize, thereby further diminishing *Brown's* applicability to this case.

Plaintiff emphasizes that there is "no purchase necessary" to participate in the sweepstakes, meaning the consideration element is absent. However, that argument has been rejected by Pennsylvania courts. In *Commonwealth of Pennsylvania v. Wintel, Inc.*, the Commonwealth Court found that "[a]lthough the player gets two free games on each visit, each game requires eight credits. Once the free credits are used, the player has four credits left. To continue playing, the player must place money into the machine." 829 A.2d 753, 758 (Pa. Commw. Ct. 2003) (affirming the trial court's conclusion "that the machines were gambling devices *per se* because they were games of chance that required no skill to play; money had to be placed into the machine to continue playing after the first 20 credits were used; and the prize was a monetary award."). The same is true here. Once a customer uses up his first 100 free credits, he must "pay to play."

Plaintiff argues, though, that this case is factually distinct from *Wintel* because a Telesweeps customer cannot purchase sweepstakes entries. Rather, instead of placing money into a machine or buying additional tokens, the customer must purchase a telephone calling card or other product to continue playing. Plaintiff attempts to create a distinction where there is none. Purchasing a product that comes with a commensurate number of "free" entries is "indirect consideration" under Act 81. Plaintiff's attempt to separate the consideration from the chance to win by inserting a step between the two elements is clever, but it merely elevates form over substance. At bottom, what Telesweeps is doing constitutes gambling.

Plaintiff further contends that its sweepstakes are legitimate because it sells a competitively-priced product that has value and is used by its customers. Even after all entries are used up, a customer may still use the full value of the phone card. The Court accepts the evidence that the phone cards are priced competitively, compared to national companies, such as AT&T which charges slightly higher rates. However, Plaintiff submitted no evidence of how many phone cards it had sold or how many minutes had been used on those cards. In fact, it does not appear that Plaintiff tracks such information, even though phone cards purportedly are one of the key drivers of its business.

Instead, Plaintiff submitted an affidavit from Faran Rahi which states that between October 31, 2011 and July 1, 2012, more than 2.3 million telephone calls were made in the United States using TelConnect and InterConnect cards. (Rahi Aff., Doc. 25, Ex. 1, ¶ 2-3). During that same time period, more than 31 million minutes of telephone time was used nationwide. (Id. at ¶ 4). However, Mr. Rahi was "unable to specify what percentage of the total number of calls and total number of minutes above originated from phone cards sold at the retail store owned by Telesweeps," (Id. at ¶ 5) which would have been crucial evidence for the Court to consider.

Moreover, though Plaintiff's witnesses testified that the market for phone cards includes students, families of military service-members, travelers, businesspeople, and people who do not own phones, there is no evidence to show these same people were

customers of Telesweeps.  Given the high burden Plaintiff must meet to merit a temporary

restraining order or preliminary injunction, this failure of evidence is critical.

To compound Plaintiff's lack of evidence, the Court finds Intervenors' witness

Richardson Williamson highly credible and accepts his testimony[11] that a phone card is

"passé, people don't use it anymore, as a rule.  People have Skype, they've got other

methods of communication that are readily available. . . . phone cards are a dying

commodity."  (Tr. of Evid. Hearing, at 191:21-192:3).  Because phone cards are, in his view,

a relic of the past, Mr. Williamson testified that they are a "ruse" and once the free credits

are used up, customers who "haven't even used their phone time," are "going back up and

buying more phone time, [and] sitting down at the device again."  (Id. at 196:23-25).  The

Court agrees.  See Lindey v. Pennsylvania State Police, 916 A.2d 703, 706 (Pa. Commw.

Ct. 2006) (concluding that the gaming coupons at issue were "a subterfuge for the gambling

device.").

The record is devoid of any evidence that the products sold by Telesweeps are used

or consumed to any significant extent, in contrast to products associated with legitimate

sweepstakes which are promoted by McDonalds, Coca-Cola, or Pepsi.  Rather, customers

are accruing large amounts of phone time because their true motivation is "for the simulated

gaming activity and for the play."  (Tr. of Evid. Hearing at 200:17-21).

---

[11] While the Court finds Mr. Williamson's testimony useful, it is not essential to the Court's ultimate decision that Telesweeps's activity constitutes gambling.  The sweepstakes constitutes gambling as defined by applicable Pennsylvania law, and as such, is within the scope of Act 81.

21

Finally, the games are set up in such a way that customers are led to believe that

their choices may affect the outcome of the game. The exhibits presented at the evidentiary

hearing show that the games look like the very same slot machines or video poker games

one would find in a casino. Plaintiff's attempt to draw a distinction between the

randomization at work in slot machines and the randomization used by Telesweeps through

the predetermination of a finite pool of entries does not change the fact that both methods

present to the player a game of chance. The only real difference is that there are no state

regulations governing Plaintiff's payout percentage in its sweepstakes. What is

demonstrably the same, however, and deliberately so, is the simulated gambling program

"does give the participant the, if you will, the look and feel of participating in actual poker."

(Nick Farley, Tr. of Evid. Hearing at 135:22-23).[12]  For Plaintiff to argue that its sweepstakes

is not gambling when it works to create a player experience which mimics casino-style

games as closely as possible is too much for this Court to accept.

In sum, Act 81 regulates conduct and not speech. As such, Act 81 need only bear a

rational relation to its legitimate interest in regulating gambling, and the Court is satisfied

that Act 81 meets the rational basis requirement. There is no dispute that the state has a

legitimate interest in regulating gambling. Though Plaintiff argues that there are less

restrictive means the state could adopt to achieve its objectives, it does not argue that Act

---

[12] *See also* David Bogansky's testimony that the simulated gambling programs "look like the casino-type games. That's what it is. If you were supposed to win five dollars, then, a display will come up that resembles five dollars . That may be cherry, cherry, cherry, root beer soda cap, apple soda cap, cherry, whatever the game theme is." (*Id.* at 28:19-23).

22

81 is *irrationally* related to the regulation of gambling. Plaintiff clearly is soliciting and encouraging patrons to gamble in its facility, and the state is well within its authority to regulate such conduct. Therefore, the Court concludes that Act 81 is valid and enforceable.

### 2. At most, Plaintiff engages in unprotected commercial speech

Even if the Court were to find that a speech element is involved, at most, it is *unprotected* commercial speech. "First Amendment protection does not necessarily attach merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written or printed." *United States v. Bell*, 414 F.3d 474, 478 (3d Cir. 2005) (citing *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502, 69 S. Ct. 684, 93 L. Ed. 834 (1949)). If the conduct at issue does have a communicative nature that renders it protectable speech, at most, it would be commercial speech subject to intermediate scrutiny. *See Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 623, 115 S. Ct. 2371, 132 L. Ed. 2d 541 (1995).

"To determine whether speech is commercial, courts should consider whether: (1) the speech is an advertisement; (2) the speech refers to a specific product or service; and (3) the speaker has an economic motivation for the speech." *Bell*, 414 F.3d at 479 (citing *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66–67, 103 S. Ct. 2875, 77 L. Ed. 2d 469 (1983)). Although counsel for Plaintiff identified the speech at issue as limited to only the "reveal,"[13] the Court will take an expansive view and also consider the advertisements at

---

[13] At oral argument, when the Court asked counsel what his client's protected speech was, counsel responded, "Did you prevail or did you not prevail in this sweepstakes?" (Tr. of Oral Arg. on Aug. 7, 2012, Doc. 33

Plaintiff's establishment as speech for the purpose of the commercial speech inquiry. Here, Telesweeps argues that it advertises its sweepstakes promotion to bolster sales of pre-paid phone cards, thereby making its advertisements and associated speech commercial.

There is a "'commonsense' distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech," meaning the Constitution "accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 562-63, 100 S. Ct. 2343, 2349, 65 L. Ed. 2d 341 (1980). That level of protection depends on the "nature of the expression and the governmental interests served by its regulation." *Id.* at 563.

"[T]he government may freely regulate commercial speech that concerns unlawful activity or is misleading." *Went For It*, 515 U.S. at 623-24 (citing *Central Hudson*, 447 U.S. at 563-564, 100 S.Ct. at 2350). If the speech concerns unlawful activity, "the government may restrict it and the inquiry ends." *Bell*, 414 F.3d at 480 (affirming district court's finding that Bell's website which advertised methods of evading payment of income taxes was both misleading and unlawful, thereby acquiring no First Amendment protection) (citing *Bates v. State Bar of Arizona*, 433 U.S. 350, 384, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977) ("Advertising concerning transactions that are themselves illegal obviously may be suppressed.")).

at 9:7-10). Later in oral argument, when the Court asked, "The information is simply the communication of whether or not you've won a prize?", counsel responded, "Hey, you've won the prize. Yes, that's the message." (*Id.* at 26:7-10). Co-counsel disagreed, saying "It's the artistic value, it's the computer code, it's the entertaining speech that's taking place here. I agree that the primary issue is the communication of the result and whether that's covered as information under *Sorrell*." (*Id.* at 37:9-12).

If the speech is neither misleading nor related to unlawful activity, though, the regulation must pass a three-part test to withstand a constitutional challenge: (1) the government interest must be substantial, (2) the regulation must directly advance the asserted government interest, and (3) the regulation must be narrowly drawn to serve that interest. *Cent. Hudson*, 447 U.S. at 566, 100 S.Ct., at 2350. Because the "speech" at issue here relates to unlawful activity, the Court will not progress through the factors of the three-part test.[14]

Plaintiff's advertisements invite patrons to purchase phone cards in exchange for sweepstakes entries which give them opportunities to win cash prizes by playing simulated gambling programs. As discussed above, the transactions are considered illegal gambling by the Commonwealth of Pennsylvania. Therefore, the speech associated with these transactions is not protected by the First Amendment and may be "freely regulated" by the government. The Court wishes to highlight that the advertisements themselves are not banned by the Act. Telesweeps is still free to advertise its phone cards and to offer

---

[14] In *Sorrell*, there was no question that the activity regulated by the statute (*i.e.*, selling doctor's prescription-buying preferences) was otherwise lawful, whereas here, the regulated activity is unlawful gambling. The Supreme Court said that "[i]t is . . . true that the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech. That is why a ban on race-based hiring may require employers to remove 'White Applicants Only' signs, why 'an ordinance against outdoor fires' might forbid 'burning a flag,' and why antitrust laws can prohibit 'agreements in restraint of trade.'" 131 S. Ct. at 2664 (internal citations omitted). Therefore, even if there is protected speech involved here, the restrictions are aimed at commerce to "directly advance a substantial government interest" that is "drawn to achieve that interest." *See id.* at 2667-68. Responding to the state's argument that the speech at issue was commercial, the Supreme Court held that even under the lesser standard of intermediate scrutiny, the statute failed because "[g]iven the information's widespread availability and many permissible uses [by non-marketers], the State's asserted interest in physician confidentiality does not justify the burden that § 4631(d) places on protected expression." *Id.* at 2668. That is patently not the case here.

simulated gambling programs to patrons so long as those patrons are not also giving

consideration in exchange for opportunities to win cash prizes.

### 3. Remaining First Amendment Challenges

Plaintiff argues in its moving papers that Act 81 is facially overbroad and also void for

vagueness. However, it did not brief these issues in any depth. Rather, it argued in its brief

that it was not waiving its arguments. (Doc. 9, at 2 n.1). Nevertheless, the Court will

address the arguments.

### Overbreadth

The Supreme Court has held that the facial overbreadth doctrine "is, manifestly,

strong medicine" *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S. Ct. 2908, 37 L. Ed. 2d

830 (1973), because when a court finds a statute is facially overbroad, the effect is "to

invalidate all enforcement of that law, until and unless a limiting construction or partial

invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally

protected expression." *Virginia v. Hicks*, 539 U.S. 113, 118-19, 123 S. Ct. 2191, 2196, 156

L. Ed. 2d 148 (2003) (internal citations and quotation marks omitted). Because the

overbreadth doctrine is so drastic,

> its function, a limited one at the outset, attenuates as the otherwise
> unprotected behavior that it forbids the State to sanction moves from 'pure
> speech' toward conduct and that conduct—even if expressive—falls within the
> scope of otherwise valid criminal laws that reflect legitimate state interests in
> maintaining comprehensive controls over harmful, constitutionally unprotected
> conduct. Although such laws, if too broadly worded, may deter protected
> speech to some unknown extent, there comes a point where that effect—at
> best a prediction—cannot, with confidence, justify invalidating a statute on its

> face and so prohibiting a State from enforcing the statute against conduct that is admittedly within its power to proscribe. To put the matter another way, particularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.

*Broadrick*, 413 U.S. at 615, 93 S. Ct. 2908. To ensure that the costs of the doctrine "do not

swallow the social benefits of declaring a law overbroad, we have insisted that a law's

application to protected speech be substantial, not only in an absolute sense, but also

relative to the scope of the law's plainly legitimate applications before applying the strong

medicine of overbreadth invalidation." *Hicks*, 539 U.S. at 119-20, 123 S. Ct. 2191 (internal

citations and quotation marks omitted). As a result, "a single impermissible application" is

insufficient to deem a statute or policy invalid, *New York v. Ferber*, 458 U.S. 747, 772, 102

S.Ct. 3348, 73 L.Ed.2d 1113 (1982) (internal quotation marks and citation omitted), and

instead, "a law should not be invalidated for overbreadth unless it reaches a substantial

number of impermissible applications." *Id*. at 771, 102 S.Ct. 3348. Because the Court has

found that Act 81 regulates conduct and not speech in pursuit of enforcement of a criminal

statute "that reflect[s] legitimate state interests in maintaining comprehensive controls over

harmful, constitutionally unprotected conduct," Plaintiff has failed to show that Act 81 is

facially overbroad. *See Hicks*, 539 U.S. at 119, 123 S. Ct. 2191. If there is any

overbreadth at all, it is insignificant in relation to the statute's "plainly legitimate sweep."

In support of its overbreadth argument, Plaintiff attempts to distinguish *Allied

Veterans* by saying the

27

Florida ordinance banned only the games not the message. In Pennsylvania, Act 81, in defining "simulated gambling program," does not mention the specific games; instead, it sweeps broadly to ban even messages by stating that any method involving an electronic video monitor which connects the sweepstakes player or participant with the cash or cash equivalent prize is outlawed. This statute would bar a simple text message communicated between Telesweeps and a patron using a computer if the message concerned the promotional sweepstakes.

(Doc. 9, at 11). This argument is itself overbroad. Act 81 would not ban a business from sending a text to a player to inform him that he has won a sweepstakes prize because the act of sending a text does not fall under a "simulated gambling program." Plaintiff's own hypothetical scenario shows that Act 81 does not target the communication of the message itself and defeats Plaintiff's overbreadth argument. The entirety of the Act targets the conduct of gambling and not the communication of a message. Because there must be so many discrete elements present before liability attaches, the statute is not overbroad.

## Void for Vagueness

"The prohibition against vague regulations of speech is based in part on the need to eliminate the impermissible risk of discriminatory enforcement, . . . The question is not whether discriminatory enforcement occurred here, but whether the Rule is so imprecise that discriminatory enforcement is a real possibility." *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1051, 111 S. Ct. 2720, 2732, 115 L. Ed. 2d 888 (1991) (internal citations omitted). When presented with a void-for-vagueness challenge, a court "must ensure that a statute or standard is fair in that it is not so vague that a party would not know what conduct is prohibited." *Borden v. Sch. Dist. of Twp. of East Brunswick*, 523 F.3d 153, 166-67 (3d

Cir. 2008). Thus, a statute is unconstitutionally vague when "men of common intelligence must necessarily guess at its meaning." *Broadrick*, 413 U.S. at 607, 93 S.Ct. 2908.

Plaintiff's argument that Act 81 is void for vagueness is baseless: by its caption, Act 81 plainly applies to gambling activities. It also clearly defines "consideration," "electronic video monitor," and "simulated gambling activity." Furthermore, Plaintiff is the party who initiated suit: Plaintiff obviously must have understood that Act 81 would apply to businesses such as itself, causing its attempt to prevent enforcement of the Act.

### 4. Conclusion

Because Act 81 regulates gambling conduct and not speech, at best, the speech at issue is unprotected commercial speech, and the Act is neither facially overbroad nor void for vagueness, Plaintiff has not shown a reasonable likelihood of success on its First Amendment claim, and so it is not entitled to either a temporary restraining order or a preliminary injunction.

### b. Irreparable harm, public interest, balancing of the harms

Plaintiff correctly asserts that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Stilp v. Contino*, 613 F.3d 405, 409 (3d Cir. 2010) (quoting *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976)). However, because the Court concludes that Plaintiff's First Amendment rights have not been violated, Plaintiff's burden becomes significantly more difficult.

First, Telesweeps can continue to operate by selling its phone cards, internet time, and office support products. Plaintiff would not be driven out of business, though its profits might be reduced considerably, thereby arguably constituting economic harm. Even assuming that such economic harm would be recoverable, Plaintiff has failed to show how it is *irreparably* harmed by Act 81. Second, the balancing of the harms weighs in favor of the Commonwealth. Though Plaintiff might be harmed financially, the Commonwealth will suffer from significant losses of tax revenues and licensing fees from all operators of internet sweepstakes cafes if the Court grants Plaintiff's requested relief.

Third, the public interest also favors the Commonwealth because the General Assembly, expressing the public's wishes, passed a statute designed to criminalize behavior that had exploited a loophole under the existing anti-gambling regime. As counsel for the Commonwealth stated, "[t]he General Assembly has repeatedly stated its public policy objectives in regulating gambling and gambling-like activity to make sure that it doesn't proliferate." (Doc. 33 at 56:14-17). Furthermore, each citizen of the Commonwealth has an interest in the state's ability to secure "funds through appropriate taxation," which results in lower real estate taxes and provides funding for necessary programs. (*Id.* at 62:21-63:1). Finally, because the internet sweepstakes industry is not regulated, operators such as Telesweeps are not constrained to maintain a certain payout ratio. The lack of regulation in this area is of substantial concern because the public is not protected. For all

of these reasons, it is well within the public's interest for the Court to refrain from issuing a preliminary injunction.

## V. Conclusion

Because Plaintiff has failed to show any of the four required elements to compel an award of a temporary restraining order or a preliminary injunction, the Court will deny Plaintiff's motion. A separate Order follows.

Robert D. Mariani
United States District Judge